# EXHIBIT A

EFiled: Sep 12 2019 03:02PM EDT
Transaction ID 64198220
Case No. 2019-0734-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REGINALD BROOME and<br>CHRIS SALSMAN,<br>Plaintiffs<br>v.<br><br>AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, and CONTINENTAL AMERICAN INSURANCE COMPANY<br>Defendants | ) | C.A.No. |

**YOU ARE IN POSSESSION OF A CONFIDENTIAL FILING FROM THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

**If you are not authorized by Court Order to view or retrieve this document, red no further than this page. You should contact the following person.**

*s/ Gary W. Aber*
GARY W. ABER (DSB#754)
704 N. King Street, Suite 200
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900
Attorney for Plaintiffs

A public version of this document will be filed on or before September 15, 2019

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| REGINALD BROOME and CHRIS SALSMAN, Plaintiffs | ) | |
| v. | ) | C.A.No. |
| AMERICAN FAMILY LIFE ASSURANCE COMPANY OF COLUMBUS, and CONTINENTAL AMERICAN INSURANCE COMPANY Defendants | ) | |

## VERIFIED COMPLAINT TO VACATE ARBITRATION DETERMINATION

Plaintiffs, Reginald Broome and Chris Salsman (hereinafter referred to as the "Plaintiffs") petition this Court, pursuant to 10 Del.C. §5714[1] for an Order of vacating the determination award of a Panel of Arbitrators, consisting of one independent neutral arbitrator, and two non-independent arbitrators selected by each party, dated June 14, 2019, in this matter of Reginald Broome and Chris Salsman v. American Family Life Assurance Company of Columbus, and Continental American Insurance Company (attached hereto Exhibit No. 1).

Plaintiffs allege as follows:

## INTRODUCTION AND BACKGROUND

1. In 2014 the Delaware Legislature passed a new statute, 29 Del. C. §5290 et. seq. which would provide for the Delaware State Employee Benefits

[1] Which statute is analogous to 9 U.S.C.A. §10(a)(4) , SPX Corporation v. GARDA USA, Inc., 94 A.2d. 745,750 (Del. 2014)

Committee to select one insurance carrier to be the exclusive provider of "supplemental insurance" to all State employees. Supplemental insurance was to include such insurance as accident insurance and critical illness insurance, which was to be provided at no cost to the State. The statute, 29 Del. C. §5292, required that "The selected carrier shall maintain a claims loss ratio of not less than 60%." The term "claims loss ratio' ("CLR") was defined as the ratio of incurred losses and loss adjustment expenses to net premiums earned." 29 Del. C. §5290.

2. As a result of the passage of that statute the Delaware State Office of Management and Budget issued a Request for Proposal ("RFP") on September 22, 2014. While the RFP had many requirements a critical one was that the RFP reemphasized the *statutory requirement* that the "selected carrier " must maintain a CLR of not less than sixty percent (60%) for the Company.

3. Notwithstanding the statutory requirement to maintain a CLR of 60%, as reemphasized in the RFP, subsequent Addendums to it, as well as reminder communications to the vendors by OMB warning of disqualification if there was no such commitment, Defendants nevertheless submitted a Response to the RFP which not only a refused to confirm they it would maintain a CLR of 60% but instead requested OMB to *"strike" the statutory mandate.* In doing so the Defendants claimed that its fictitious non-existent entity maintained a high CLR of

56%, realizing it was well established, well-known that such a response would result in immediate disqualification of the Defendants' Proposal.

4. Thereafter the Plaintiffs, who had helped draft and usher the development of the statute through the Delaware Legislature with the assistance from OMB, realized that there would be an automatic disqualification and took steps, on their own to correct the Defendants' error and to revise the RFP Response to describe a CLR of 68%, a number on which Plaintiffs had been trained by the Defendants.

5. As a result of the efforts of the Plaintiffs, Defendants and/or (Continental American Insurance Company ("CAIC") was chosen as a finalist in the selection process by OMB.

6. Subsequently Defendants learned of the corrections made by the Plaintiffs and proceeded to terminate their employment.

7. Defendants realizing that they had been selected as a finalist based upon the corrections made by the Plaintiffs declined to re-submit their original Response to the RFP, but rather requested and received permission from OMB to submit, not their original Proposal, but a revised Proposal, which was then initially rejected by OMB.

8. After further consultations between Defendants and OMB, CAIC submitted another revised Proposal describing a CLR, not for the statutorily

required carrier, CAIC, as a Company/Carrier, but rather only for the two products it intended to market in Delaware.

9. OMB, without explanation allowed CAIC's final submission, which violated both the statute and the original RFP to be considered, resulting in CAIC being awarded the contract to be the exclusive provider of supplemental insurance to State employees.

10. It was acknowledged that but for the actions of the Plaintiffs, Defendants would have been disqualified during the initial bid process, would not have been selected as a finalist, and would not have been able, contrary to the specific terms of the RFP, to resubmit not one but two new Proposals.

11. By declining to resubmit its original Proposal, describing a disqualifying 56% CLR, of a non-existent fictitious entity, but by accepting the benefit of being selected as a finalist, as a result of the Plaintiffs efforts, resulting in CAICs being awarded the contract, Defendants accepted the benefits of the Plaintiffs actions thereby ratifying them.

## PARTIES, JURISDICTION , and VENUE

12. The Plaintiffs, Reginald Broome and Chris Salsman (hereinafter referred to as "Plaintiffs" ) are residents of the State of Delaware who were at all relevant times during the events described herein licensed insurance agents under contract to the Defendants.

13. The Defendant, American Family Life Assurance Company of Columbus ("Aflac") is a corporation organized and existing under the laws of the State of Nebraska, but who, pursuant to the provisions of 18 Del. C. §524 is subject to service of process by serving the Insurance Commissioner of the State of Delaware.

14. The Defendant, Continental American Insurance Company ("CAIC") is an insurance company licensed to do business in the State of Delaware and it is subject to service of process pursuant to 18 Del. C. §524.

15. The Plaintiff, Salsman, signed an Associate's Agreement with Defendants on or about January 2009.

16. The Plaintiff, Broome, signed an Associate's Agreement with Defendants in March of 2008, and a District Sales Coordinators Agreement in December of 2008 which was signed by a representative of defendants and a representative of Defendants signed a Regional Sales Coordinator Agreement with Broome on January 11, 2009.

17. The Plaintiff Broome signed a Special Projects Coordinator's with Defendants in December 2010 which was also signed by a representative of Defendants in January 2011.

18. The Plaintiffs were, pursuant to the Agreements referred to in ¶¶15-17

authorized by the Defendants to solicit and sell insurance products issued by the Corporate Defendants.

## COUNT I
### (Manifest Disregard of the Law: Breach o Contract: Ratification of Alleged Improper Conduct)

19. Plaintiffs incorporate and make a part hereof the allegations contained in ¶¶1-18.

20. In the Spring of 2013 the Plaintiffs, in furtherance of the interests of the Defendant Aflac began discussions with certain State Legislators of the State of Delaware, and representatives of the Public Employees Union of the State of Delaware; to develop a program for the sale of indemnity insurance to all State employees.

21. Prior to the Spring of 2013 only State licensed educational personnel were permitted to buy indemnity insurance as a part of a state's sponsored insurance program.

22. The purpose of the Plaintiff's discussions was to extend the ability of all State of Delaware employees to purchase, as a supplemental insurance, indemnity benefits.

23. It was the intent of the Plaintiffs to develop a market for Aflac's Indemnity Insurance to be offered to any State of Delaware employees on an exclusive basis.

24. During the Spring of 2013 a legislation known as "House Bill 336" (HB336) was introduced into the House of Representatives of the State of Delaware as proposed legislation to provide a "Supplemental Insurance Program" providing for voluntary insurance benefits designed to supplement then existing major medical coverage where the payments were predetermined and paid regardless of other available insurance.

25. The benefits were intended to be offered to State of Delaware employees and any eligible employee as defined by §§5501(e) and 5201(c) of Title 29 who would elect to participate in the supplemental insurance program as specified in 29 Del. C. §5293.

26. As a result of the efforts of the Plaintiffs the Delaware House of Representatives, on June 17, 2014, voted 41-0 in favor of the proposed legislation.

27. As a result of the efforts of the Plaintiffs on June 26, 2014 the Delaware State Senate voted 21-0 in favor of the proposed legislation.

28. On August 6, 2014 the legislation, formerly known as HB336 was signed into law by the Governor of the State of Delaware, to be designated 29 Del. C. §5290, et seq.

29. During September 2014 the Plaintiffs, following recommended

procedures/policies, began to work with the Defendant in anticipation of the issuance of a Request for Proposal by the State of Delaware for Insurance pursuant to 29 Del. C. §5290, et. seq.

30. The Delaware Office of Management and Budget ("OMB") issued the RFP on September 22, 2014.

31. The RFP issued by the State of Delaware set deadlines of October 3, 2014 for a Notice of Intent to Bid.

32. The RFP issued by the State of Delaware set deadlines of October 10, 2010 for the State of Delaware to respond to vendor questions.

33. The RFP issued by the State of Delaware set a deadline of October 17th at 12:00 p.m. for submissions of proposals in response to the RFP, to be submitted to the Delaware Office of Management and Budget.

34. On October 10, 2014 OMB issued Addendum No.1, warning that any vendor, such as the Defendants who failed to meet any single requirement of the RFP's would be disqualified, including a specific reference to the statutorily mandated 60% CLR.

35. During the months of September, and October 2014 Plaintiffs worked feverishly to educate and inform the Defendants that under the terms of the statute and the RFP Aflac would be disqualified automatically, as described in OMB's October 10, 2014 Addendum.

36. The Plaintiffs' Manager acknowledged in writing that fact and told the Plaintiffs that he would attempt to convince Defendants of the consequences of their non-compliant numbers.

37. Plaintiffs never received a response from the Defendants.

38. After further discussions with their supervisor, in order to prevent Aflac from submitting a non-compliant and fraudulent numbers to the State of Delaware on September 16, 2014 the Plaintiffs requested a conference call with the Defendant to discuss the development for the Request for Proposal (hereinafter referred to as "RFP").

39. On September 20, 2014 the Plaintiffs had contact with the Defendant where it was acknowledged that it was clear that the Plaintiffs played the most significant role in obtaining the enactment of HB336 being, enacted as 29 Del C. 5290, et. seq.

40. On September 22, 2014 the Plaintiffs contacted Defendant to begin developing an RFP response.

41. On September 22, 2014 the Plaintiffs requested from the Defendants rates to satisfy the RFP and the provisions of the new legislation, HB336.

42. On September 23, 2014 Plaintiffs requested a conference with the Defendants, to review differences between Aflac's response to RFP and the requirements of HB 336.

43. On September 26, 2014 the Plaintiffs again requested a conference with Defendant to discuss discrepancies between HB336, the Statute, and the Defendants' response to the RFP.

44. On October 10, 2014 the State of Delaware issued Addendum No. 2 with responses to Vendor Questions.

45. The responses to Vendor Questions included instruction that all vendors should certify that their "claim loss ratio" was minimally 60% as shown in vendor's "Annual Statement", and stated that a vendor who did not meet that 60% loss ratio would be disqualified.

46. Defendants' claims loss ratio, as described in educational materials provided to all its representatives, including the Plaintiff's showed average over the past 10 years was between 68% and 72%, exceeding the requirements of the RFP.

47. On October 12, 2014 Plaintiff's requested a conference with Defendats to confirm calculations on a claim loss ratio.

48. The Defendants did not respond to the request for conference.

49. On October 14, 2014 the Defendant indicated to the Plaintiffs they would be given the opportunity to proof read the Defendants' RFP before it was finalized and submitted, making proposals for both Individual products (American family Life Assurance Company of Columbus) and group products (CAIC).

50. On October 15, 2014 Plaintiffs requested a conference with Defendants in response to Defendants request for a copy of HB336 and the State's responses to Vendor Questions.

51. The Defendant never responded to the request for a conference.

52. On October 16, 2014, Plaintiffs learned that the Defendant was not including all of its insurance businesses in calculating the claims loss ratio, which would be in violation of requirements of the RFP's definition of a claims loss ratio based upon the relevant Statute.

53. On October 16, 2014 Plaintiffs requested an emergency conference call with Defendant upon learning that the response by the Defendants to the State of Delaware's RFP would indicate that Defendants' Claims Loss Ratio was 56%, less than the required 60% mandated by the statutes and RFP.

54. Plaintiffs received no response to the request for the emergency Conference.

55. On October 17, 2014 Plaintiffs received for the first time a link to an electronic "read only" copy of the full proposal for both Personal Insurance and Group Insurance to be submitted by the Defendants, in response to the RFP, only hours before the 12:00 p.m. deadline, and which proposal claimed a 56% Claims Loss Ratio.

56. The State of Delaware's Request for Proposal ("RFP") required

any response to contain a certification by the defendants that the defendants maintained a Claims Loss Ratio of not less than sixty percent (60%).

57. The Response of the Defendants, to the State of Delaware's RFP, prepared by the defendants, that the plaintiffs were permitted to review, proposed that the RFP requirement for a certification that the defendants maintained a Claims Loss Ratio (CLR) of not less than sixty percent (60%) be struck from the RFP, which would have resulted, as stated by OMB in its October 10, 2016 response to Vendor's Questions that any "…vendor who (did) not meet (that) requirement is disqualified."

58. On that same day, October 10, 2016, Delaware's OMB issued Addendum No.2 to the RFP reemphasizing that the failure to meet any single requirement of the RFP, specifically mentioning the mandatory 60% CLR "is disqualified".

59. The Response of the prepared by the Defendants to the State of Delaware's RFP,that the plaintiffs were permitted to review, stated that "Aflac boasts a relatively high loss ratio of 56%".

60. Aflac's response to the RFP would have disqualified Aflac from being a successful bidder.

61. Rather than commit to "maintain" a 60% CLR, as required by the statute, for the carrier who would be selected to be the exclusive provider of

supplemental insurance, as required by the Statute, 29 Del. C. §5292, Defendants' original proposal was for a CLR of a non-existent fictitious entity, "Aflac US" created by taking numbers from only selected subsidiaries of Aflac, Inc., but not from just CAIC, the hoped for "carrier" to be selected, resulting in a disqualifying 56% CLR.

62. The 56% CLR boasted of by Defendants was of a non-entity, "Aflac US", which did not exist, did not do business, and did not issue policies. As a result the Defendants did not comply with the statutory requirements of 29 Del. C. §5992 and would not have been the *carrier* that could not have been licensed in Delaware and could not have been selected to be the exclusive provider of supplemental insurance.

63. Moreover the Defendants never intended to comply with the provisions of 29 Del. C. §5292 , to "… maintain a CLR of not less than 60%." but rather sought to have OMB *strike the statutory requirement* of maintaining a CLR of 60%.

64. On October 17, 2014 at approximately 9:00 a.m., three (3) hours before the deadline for response to the RFP to be submitted, Plaintiffs again contacted Defendants requesting an emergency conference concerning the claims loss ratio as shown in Aflac's response to the RFP.

65. Subsequently, on October 17, 2014 the Plaintiffs developed pages to

convey the correct claims loss ratio to be included in Aflac's response to the RFP, and made corrections for the RFP response, and with the permission of the OMB and at their office, made corrections to Defendants' Proposal indicating the CLR for the "carrier" was historically 68%, as they had been trained by the Defendants, and as publicly represented by Defendants.

66. At approximately 11:45 a.m. Plaintiffs notified their Defendants' designated supervisor that the corrections had been made to Defendants' response to the RFP to correctly reflect Defendants CLR.

67. On October 24, 2014 the State of Delaware notified the Defendant, Aflac, that, based upon the information supplied by Aflac, and as corrected by the Plaintiffs, Aflac had been selected as a finalist with a November 20, 2014 in person presentation date.

72. In November 2014 the Defendants, including CAIC, became aware of the corrections made by the Plaintiffs.

73. On December 3, 2014, notwithstanding that the Defendants had not been disqualified, the Defendants terminated the contracts with the Plaintiffs, because of a untrue claim they had "misrepresented policy benefits or provisions or premiums" for bypassing Defendants' guidelines to get business processed.

74. After learning of the corrections made by the Plaintiffs the Defendants reported their conduct to the Delaware Department of Insurance.

75. On July 15, 2015 the Department of Insurance, after Defendants notification to it of the Plaintiffs' actions issued a finding that it had "…completed its investigation…", and that "The investigation did not indicate a violation of Title 18, the Delaware Insurance Code.".

76. The reference by the Department of Insurance to its investigation was to a procedure in which both the Defendants and the Plaintiffs fully participated in responding to inquiries from the Department of the facts surrounding the OMB's RFP process and the Plaintiffs' conduct in correcting Defendants' attempts for itself and for OMB to violate the statutory mandate of 29 Del.C. §5292.

77. After learning of the corrections made by the Plaintiff's Defendants sought to have OMB accept, rather than the statutorily required CLR for the carrier of 60%, but rather CLR's for only the two products, 50% for Accident Insurance and 55.2% for Critical Illness policies, not a carrier's CLR, and both well below the statutory requirement of 60%.

78. At no time did the Defendants ever request OMB to accept the *original uncorrected Response to the RFP* in which Defendants boasted of a CLR of a 56% and sought to have the *statutory 60% requirement stricken*.

79. When OMB rejected the pricing for only two of Defendants' products of 50% and 55.2% CLR's, which were lower than their original boasted of 56% CLR,

thereby increasing Defendants' profits, Defendants again, for a second time, tried to "reprice" its Proposal.

80. OMB again rejected the repricing stating that the CLR needed to be for a *carrier wide* loss ratio. Defendants responded that, despite the fact that the Defendant, CAIC did have a claims loss ratio, the CLR used in its annual report was companywide and not just for CAIC, ignoring the fact that CAIC's CLR could have been calculated from its own Annual Report.

81. Defendants agreed to reprice their two *products* to an "anticipated", but committed to, 60% CLR, thus still in violation of the statute's requirement to commit to maintain a CLR of 60%.

82. Eventually Defendants were able to importune OMB, and OMB agreed to allow CAIC to submit only an "anticipated" 60% CLR for only its two products, rather than agree to the selected "carrier" to "…maintain a CLR of not less than 60%."

83. The actions of OMB in approval of the revised pricing, eventually suggested by Defendants, on its third attempt, was not in compliance with the State statute, <u>29 Del. C.</u> §5292, effectively, as requested by Defendants, providing for OMB's *striking the statute's mandate*.

84. But for Plaintiffs actions in preventing the disqualification of Defendants initially the Defendants would never have been able to attempt to and renegotiate a CLR that, although violative of the statute, would be accepted by OMB,

85. Defendants, having accepted the benefits of the Plaintiffs actions, were eventually awarded the final contract by OMB in December of 2014.

86. The Defendant's accepting the benefit of the Plaintiffs' action, which allowed the Defendant to be selected as a finalist, rather than being disqualified, and to eventually be awarded the State contract, was a ratification of the Plaintiff's actions.

## The Arbitration Process

87. The Agreements signed by the Plaintiffs, referenced in ¶¶15, 16 consisted of, in the initial agreements twenty four (24) pages of single spaced language which included in ¶10.1, et. seq. and "Arbitration Agreement" that any dispute would be subject to mandatory and binding arbitration.

88. The arbitration procedure, as set out in ¶10.2, required: "the parties agree to attempt, in good faith, resolve the Dispute within fifteen (15) days of the date that notice of dispute has been given to the other party or parties."

89. When a request was made on behalf of the Plaintiffs to attempt to resolve this dispute, Defendants refused.

90. The provisions of the arbitration language provided that each party would select or would name an arbitrator ("Party Arbitrator"), who did not need to be neutral, who would then appoint a neutral person to service a third Arbitrator ("Neutral Arbitrator").

91. The language describing the Arbitration Proceedings provided that there would be reasonable discovery as permitted by the Federal Rules of Civil Procedure.

92. The Parties agreed that the laws of the State of Delaware would apply to the arbitration proceedings.

93. The arbitration proceedings, under the agreement, ¶10.2, provided that: "The final award should be made in writing, signed by the arbitrators, and should be rendered within thirty (30) days after the completion of the Hearing…"

94. The arbitration in this matter was held beginning on April 30, 2018 and continued for five (5) through May 4, 2018 where it was concluded.

95. Despite the arbitration agreement that a final award be rendered with thirty (30) days after the conclusion, it was ordered, over Plaintiff's objection, that there would be full briefing.

96. That briefing schedule set by the Arbitration Panel provided only for mutual Opening Briefs and mutual Reply Briefs, after which briefing concluded on August 24, 2018.

97. Upon information and/or belief following the completion of the parties briefing, but almost immediately prior to the Arbitrator's decision conference, the Defendants through their non-neutral party arbitrator submitted a supplemental Memorandum further arguing the merits of the Defendants' position.

98. The non-neutral arbitrator appointed by the Defendants had in the past represented and acted as attorney for the Defendants.

99. Any supplemental Memorandum by and/or on behalf of the Defendants was submitted without consultation with or knowledge of the Plaintiff's.

100. Upon information and/or belief a supplemental Memorandum submitted by and/or on behalf of the Defendants was done without consultation with, prior knowledge of , or permission of the neutral arbitrator.

101. The Plaintiffs were never offered any opportunity to respond to any supplemental memorandum, if any, filed by or on behalf the Defendants.

102. The arbitration Opinion was issued before the Plaintiffs' had any reason to understand or form a belief that the Defendants non-neutral arbitrator had submitted any supplemental Memorandum.

103. The Arbitration Award was issued, not as the Agreement required within thirty (30) days, but ten (10) months later on June 14, 2019. (copy attached as Ex. No. 1)

104. The Arbitration Opinion, made by the majority of three Arbitrators, manifestly disregarded the law where they were fully aware of the existence of a clearly defined governing legal principle regarding Aflac's ratification of Plaintiffs' actions, by accepting the benefit of their actions, but refused to apply it, effectively ignoring it.

105. The Plaintiffs thoroughly briefed and presented arguments to the Arbitrators discussing the legal principle of Aflac's ratification of Plaintiff's conduct in both their Opening Brief and in their Answering Brief, the latter of which specifically pointed out that the Defendants' Opening Brief did not mention or refer to the issue of ratification.

106. In their presentation to the Arbitrators the defendants did not present any rebuttal any contrary arguments regarding Plaintiffs' arguments claiming that the Defendants had ratified the actions of the Plaintiffs.

107. The Opinion by a majority of the arbitrators manifestly disregarded the law regarding the Defendants accepting the benefit of the Plaintiffs actions, allowing the Defendants not to be disqualified, but to continue the bidding process, resubmit revised non-compliant CLR calculations, by focusing only on the Plaintiffs conduct and making no mention whatsoever of the actions by the Defendants, which were in violation of 29 Del.C. §2592.

108. The issue of the Insurance Commissioner exoneration of the Plaintiffs' conduct finding there had been no violation by them of the Delaware Insurance Code, Title 18, was presented to the Arbitrators in the both the Plaintiffs' Opening Brief and their Reply Brief.

109. The only reference by the Defendants in their briefing to the Insurance Commissioner's findings and decision exonerating Plaintiffs, finding no violation by them of Title 18 of the Delaware Insurance Code, was to misrepresent the record and facts, wrongfully claiming that the Insurance Commissioner only closed its investigation without giving any reasons for doing so, which directly contradicted the Insurance Commissioner's Correspondence, stating that it closed its investigation for the reason that its "...investigation did not indicate a violation of Title 18, the Delaware Insurance Code."

110. The Arbitration Award, made by the majority of the Arbitrators. manifestly disregarded the law and the clear principles of issue preclusion where they were fully aware of the existence of the Delaware Department of Insurance's findings that its investigation found no indication of the Plaintiffs' having violated Title 18, the Delaware Insurance Code, a clearly defined governing legal principle, but ignored and did not refer to that finding and conclusion when the majority accepted the clear distortion by the Defendants claiming and finding a violation of Title 18, thereby disregarding the clear legal principle of issue preclusion.

## COUNT II

### (Manifest Disregard of the Law: The Delaware Whistleblower Statute, 19 Del.C. §1701 et.seq.)

111. Plaintiffs incorporate and make a part hereof the allegations contained in ¶¶1-110.

112. When Broome and Salsman became aware that the Defendants were going to submit a non-compliant CLR only boasting of a 56% CLR, and while Defendants were requesting that the *statutory mandate of* 29 Del.C. §2592 *be stricken* by OMB , as well as Defendants' claim that the 56% was from a combination of companies of which Salsman and Broome had never heard, they reasonably believed that there was about to occur a violation of Delaware statutory law.

113. Realizing that the 56% CLR was materially contrary to and "inconsistent with the financial management standard" required by 29 Del. C. §5290, et. seq., the Plaintiffs communicated with OMB suggesting an error had been made regarding the proposed CLR by the Defendants, that it was not in compliance with the statute, requesting an opportunity to correct the error of Defendants non-compliance.

114. Defendants' financial experts conceded that their attempts to calculate a CLR was derived from Defendants' financial reports which were required by the

United States Security and Exchange Commission describing how Defendants managed their business.

115. The majority of the Arbitration Panel found that the reporting by the Plaintiffs of the deviation from the requirements of 29 Del. C. §5290, et. seq. was not a deviation from "financial management standards" required by laws of the State of Delaware, when they reported the deviations to both OMB and to the Defendants, by notifying their immediate manager, in part because the Defendants *post hoc* claim that they were "...willing to risk losing out on this opportunity rather than comply with Delaware's CLR requirement.", where the Defendants had at the same time requested OMB to *strike* the mandatory statutory requirements of 29 Del. C. §5292.

116. The Defendants *post hoc* nature of Defendants' claim they were willing to risk losing out on the bidding was further demonstrated by the Defendants' Answer to the Amended Complaint when Defendant specifically denied that their boasted of 56% CLR, which was less than the CLR mandated by the statute and RFP, would have disqualified them.

117. The Plaintiff's thoroughly briefed and presented arguments to the Arbitrators discussing the legal principles of the provisions of 19 Del. C. §1701 et. seq., that the Defendants request that the statutory mandated CLR of 60% would be

violated by the Defendants submissions, especially in light of the request by the Defendants that the statutory requirements *be stricken.*

118. The opinion by the majority of the Arbitrators manifestly disregarded the law regarding Plaintiffs reporting to both their supervisor and the State of Delaware, OMB, Defendants deviation from the mandate of 29 Del.C. §5290 et.seq. promulgated by the State of Delaware, regarding the financial management of the CLR's of the "carriers", not the individual products, evidenced by boasting of their non-compliant CLR and requesting the statutory mandates of 29 Del. C. §5292 *be stricken.*

WHEREFORE, Plaintiffs respectfully request this Court to:

A. Enter a judgment vacating the Arbitrators' Determination and issue an Order finding that the Defendants ratified any conduct of the Plaintiffs for which they asserted a ground or termination of their Agents Agreements.

B. Enter a judgment vacating the Arbitrators' Determination and issue an Order finding That the Defendants' action were in violation of 19 Del.C. §1701 et.seq.

C. Grant Plaintiffs such further and other relief as may be appropriate and just in the circumstances.

*s/ Gary W. Aber*
GARY W. ABER (DSB#754)
704 N. King Street, Suite 200
P.O. Box 1675
Wilmington, DE 19899
(302) 472-4900
Attorney for Plaintiffs

Dated: September 11, 2019